

**LAW OFFICES OF ERIC FRANZ, P.L.L.C.**
www.efranzlaw.com
(212) 355-2200 (phone)
(212) 937-2217 (fax)

December 11, 2020

<u>BY ECF</u>
The Honorable Judge I. Leo Glasser
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza
Brooklyn, NY 11201

      Re:    *United States v. Patrick Juarez,* **17-Cr-632 (ILG)**

Dear Judge Glasser:

      We respectfully submit this letter in advance of the upcoming sentence of Mr. Patrick Juarez ("Patrick"), currently scheduled for December 18, 2020 following his March 1, 2019 plea of guilty, to conspiring to distribute and possess controlled substances which involved 400 grams or more of fentanyl and cocaine, in violation of 21 U.S.C. §846 and 841(b)(1)(A)(vi).

\*\*\*

While we do not seek to minimize Patrick's criminal behavior or trivialize his flight, we submit that the conditions of confinement which he has endured, his untreated medical condition and his strong family bond, militate in favor of leniency when determining the appropriate sentence.

## I.  Legal Standard

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing judge can impose a sentence. The sentencing court may consider the guideline range, as well as any basis to depart from that range. However, the court is no longer required to impose a sentence within that range. In fact, the federal sentencing guidelines are but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). The guidelines are only the "starting point and initial benchmark…" *Id., citing Gall v. United States*, 552 U.S. 38, 50 (2007). "Sentencing courts are not to 'presume that the Guidelines range is reasonable,' and instead they 'must make an individualized assessment based on the facts presented.'" *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (internal citations omitted). It is the sentencing judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors. *Id., Kimbrough*, 552 U.S. at 109, *citing Gall*, 552 U.S. at 51.

In determining a sentence that is "sufficient, but not greater than necessary," the first of those factors the judge must consider is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Without a doubt, the breadth of this factor alone extends far beyond the guidelines and implores the sentencing judge to consider the unique circumstances and characteristics of the defendant in each case. A consideration of those characteristics, along with the remaining six factors,[1] may render sentences that do not fit within the guidelines, yet are fair and meet the goals of sentencing set forth in § 3553(a)(2).

Therefore, the Court may not simply presume that the Guidelines range is reasonable. *Gall*, at 50. Rather, the Court must make an individualized assessment based on the facts presented. From its unique vantage, the Court may conclude that, despite the guidelines, "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing. . ." *Kimbrough*, 552 U.S. at 101, *citing* 18 U.S.C. § 3553(a). The not "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law" and "provide just punishment for the offense." 18 U.S.C. § 3553(a). Indeed, as the Supreme Court suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case. *Gall*, at 54; *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (observing that district court may consider arguments that "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

---

[1]  The seven factors are (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to reflect the goals of sentencing set forth in § 3553(a)(2); (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims. *See* 18 U.S.C. § 3553(a).

II.  **Sentencing Guidelines Calculation**

Here, there is no dispute concerning the calculation of Patrick's applicable guidelines range which is:

**U.S.S.G. Calculation**

| | |
|---|---|
| Base Offense Level: | 30 |
| Obstruction of Justice: | +2 |
| Acceptance of Responsibility: | -3 |
| Total Offense Level: | 29 |

Since Patrick is in Criminal History Category IV (PSR ¶43), his advisory guidelines range is 121-151 months imprisonment. PSR ¶91.

Flight/Obstruction of Justice

Thus, while we do not quarrel with the technical application of the two-point obstruction of justice enhancement provided by U.S.S.G. §3C1.1 (PSR ¶¶ 23, 28), we respectfully submit that, when viewed in context, it results in an elevation of Patrick's guidelines calculation which warrants the Court's consideration of a variance in the form of a below guidelines sentence.

III. **Circumstances Worthy of Consideration**

a.  **Conditions of Confinement at the MDC**

Housed at the MDC since July 23, 2018 (PSR ¶21), Patrick experienced unusually harsh conditions of confinement, first during the heat and power outage in January/February 2019 where temperatures in the cells dropped to 34 degrees and most recently, throughout the COVID-19 pandemic.

### 1. Power Outage

We respectfully submit that the cruel and inhumane confinement endured by Patrick while housed at the MDC during the extended heat and power outage in the dead of winter warrants consideration in mitigation. *Cf., e.g., US v. Carty*, 264 F.3d 191 (CA2 2001). During a bitterly cold week between January 27, 2019 and February 3, 2019 where temperatures dropped below zero, the MDC experienced a partial power outage that led to the shutdown of heat and hot water.[3] Temperatures in the cells dropped to just 34 degrees.[4] Locked in his cell for up to 23 hours a day, Patrick, along with others struggled to stay warm,[5] where he was freezing cold, ate spoiled food and was unable for days to flush the toilet he shared with his cellmate.

Following the blackout, various courts granted downward sentencing variances in recognition of the awful conditions of confinement at the MDC. In *U.S. v. Acosta De La Rosa,* 18 Cr. 667 (PKC), Judge Chen noted that a variance was warranted since inmates at the MDC were "subjected to very cruel conditions," and that "there was a reluctance of the part of the officials [at MDC Brooklyn] to correct the conditions or even to disclose them timely."[6] See also *U.S. v. Bruney*, 18 Cr. 542 (PKC)(E.D.N.Y. 3/12/19). In addition, S.D.N.Y. Judge Jesse Furman reached the same conclusion:

> It's pretty clear to me…that steps could have been taken, and taken more quickly, to address the problems [at the MDC]. And the bottom line is, the conditions that I read about are the conditions that one associates with a third world country and not a country like this, and nobody in detention . . . should have to endure that as the detainees did at the MDC.[7]

Thus, we respectfully submit that the conditions of confinement which Patrick endured during the MDC blackout is a factor which this Court should consider in determining the appropriate sentence. But… there's more… unfortunately. Enduring what he thought was reminiscent of a nightmare ceasing to end, 2020 brought an unprecedented pandemic: Covid-19.

### 2. Covid-19 Pandemic

In the U.S. alone, to date, there have been 288,762 deaths and 15,271,571 reported cases of Covid-19.[8] The national COVID-19 epidemic, without question, is beyond anything contemplated by

---

[3] "*No Heat for Days at a Jail in Brooklyn Where Hundreds of Inmates are Sick and 'Frantic'*" New York Times, https://nyti.ms/2UCOImd, (February 1, 2019)
[4] *Id.*
[5] "'It's Cold as Hell': Inside a Brooklyn Jail's Weeklong Collapse", New York Times, https://nyti.ms/2E41MeL (February 9, 2019)
[6] *Ex. A; Tr. of Sent. Hr'g. at 12, United States v. Acosta De La Rosa*, 18-CR-667 (PKC)(E.D.N.Y. June 4, 2019).
[7] *Ex. B; Tr. of Sent. Hr'g at 31, United States v. Ozols*, No. 16-CR-692 (JMF) (S.D.N.Y. Feb. 12, 2019).
[8] Center for Disease Control("CDC") https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us html, last accessed December 11, 2020.

the drafters of the Sentencing Guidelines. The important notion of "just punishment" was never meant to include the ramifications of serving a guidelines sentence during a global pandemic.

There is no need to reiterate the staggering facts and statistics that have inundated the Courts regarding the spread and lethality of the disease. For the public at large, the threat has proven more than theoretical. That threat, however, is magnified for those in custody. Notably, a prison doctor acknowledged, in a letter to the editor of the LA Times, dated March 20, 2020 that, "prisons are petri dishes for contagious respiratory illnesses."[9]

Because inmates cycle in and out of Bureau of Prisons facilities from throughout the country and the world, and because people who work in the facilities leave and return daily, without screening or testing, each day brings a renewed risk of infection to a literally captive population. As of December 11, 2020, there are 6,882 federal inmates and 1,743 BOP staff who have confirmed cases of Covid-19.[10]

In each of the local pre-trial facilities – MCC and MDC – there have been confirmed positive tests for COVID-19 by both inmates and corrections officers. At MDC alone, as of December 11, 2020, there are 87 confirmed cases of Covid 19.[11] Since March, the MDC has been in various states of lockdown, with limited time to shower, review discovery, make legal or personal calls, etc. Currently, Patrick is confined to his cell for twenty two and one-half hours per day, and is afforded only 3 showers per week – he otherwise remains in his cell, an already cramped space which he shares with his cellmate.

We respectfully submit that, despite its "best efforts" the MDC is unable to protect the health and safety of defendants. Patrick is aware, every minute of every day, of the risk he faces and of his helplessness to minimize it. The inmates have no masks, no hand sanitizer and limited or no access to soap. Unfortunately, the virus is spreading and Patrick, and every other inmate, remains vulnerable to infection. Adding to that stress, is the sobering awareness that even routine medical conditions, as well as Patrick's medical complications (described below) are not adequately addressed. Patrick remains untreated and has no confidence that were he to contract the virus, effective medical care would be provided.

Time spent under such intense emotional strain simply cannot be equated with the anticipated punishment represented in the sentencing guidelines. It would be unjust to discount this reality. Reduced to its essence, we respectfully submit that each month served in the MDC during this pandemic is "worth more" when considering the requirement of just punishment than a month spent under more "normal" circumstances.

In an undated letter to counsel, four months into the pandemic, Patrick expressed confusion, frustration and deep sadness: "I don't know what to do. I'm so depressed. It's like I was left to die in here". *Exhibit C*. Limited to just one hour to be out of his cell, Patrick struggles to do all that is necessary: take a shower, check-in with his family often enduring long lines to use the phone. *Id*. His "anxiety at an all time high" [sic] resulted in Patrick now taking medication, *buspirone*, to cope. These conditions are unprecedented and certainly worthy of consideration by the Court when determining the measure of punishment which Patrick has already experienced. Notably, in *U.S. v. Aracena De Jesus,* 20 Cr. 19

---

[9] https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration
[10] https://www.bop.gov/coronavirus/, last accessed December 11, 2020
[11] *Id*.

(PAE), Judge Englemayer granted a substantial downward variance to a defendant while recognizing the severity of the punishment of being incarcerated during this pandemic:

> Finally, I am mindful . . . that you have served most of your time in prison so far during the worst pandemic in this country during the past 100 years. I'm mindful that you may have contracted COVID-19 while in prison. I'm mindful that your experience in prison as a result of the pandemic, the preceding lockdown, the ensuing lockdown, and your own illness was frightful. Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close.

*Exhibit D, Sentencing. Tr. at 36:10–18.*

***

> Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December.

*Id. at 37:6-11.*

### 3. Patrick's Futile Attempts to Receive Proper Medical Treatment

Unfortunately, not only has Patrick experienced the unusually harsh confinement conditions presented by the MDC blackout and the ongoing Covid-19 crisis, he also continues to suffer from a lack of meaningful medical attention to what has proven to be an ongoing, undiagnosed and untreated medical condition which has caused him to spit or cough up blood for well over one year.

Shortly before his arrest in the instant case, Patrick underwent gastric sleeve surgery in August 2016 in an effort to regain control of his excess weight.[12] In 2019 he was diagnosed with hyperthyroidism and is prescribed *Methimazole* as treatment. However, beginning with 2018, he began to experience bouts of spitting up blood. Despite numerous attempts to seek treatment – including repeated requests to be evaluated, Patrick's symptoms remain undiagnosed and worse still, untreated and unremedied. PSR ¶58. Commencing on December 23, 2019, Patrick has been seeking medical treatment for his ailment to no avail. Consequently, in a letter dated April 6, 2020, undersigned counsel notified the Court, via letter (ECF No. 65) of Patrick's inability to obtain treatment and the Bureau of Prisons subsequently provided the Court with a letter, dated April 11, 2020 (ECF No. 67) which claimed that "Mr. Juarez has not received a diagnosis regarding his alleged spitting up blood because his intermittent, vague, unreliable accounts to medical staff have not resulted in any discernible, diagnosable, medical ailment." Despite this account by the Bureau of Prisons, its letter to the Court indicates that "Should Mr. Juarez require medical attention in the future, he may request sick call from a health services provider […] to ensure that he receives appropriate care". Mr. Juarez did just that.

---

[12] As indicated in both the PSR and in the indictment, Patrick's aliases include "Gordito" which loosely translates to "fatty" and "Fatboy".

Since May of this year, Patrick submitted over ten additional requests for medical attention, (*Exhibit E*) yet no diagnosis, treatment or remedy has been provided. Put simply, he continues to spit up blood, and has even engaged in his own research which revealed that one of his prescribed medications, *Methimazole*, may cause the side effect of "Couphing up blood"; information which he shared with the medical staff, but to date, no diagnosis or remediation plan has been offered. *Exhibit E at 009-010*.

Suffice to say that in addition to the unfortunate conditions of confinement resulting from the MDC blackout and the Covid-19 pandemic, Patrick's pleas for medical assistance from the MDC has been in vain. Despite the anticipated assurances from the MDC medical staff that Patrick has received proper medical care, the fact remains that whatever is causing him to spit up blood remains untreated and unremedied. We respectfully submit that Patrick's inability to obtain proper medical care is a factor which this Court may consider, among others, in affording Patrick leniency in the form of a reduced sentence.

### b. Personal History and Characteristics

No stranger to the criminal justice system[13], Patrick readily acknowledges his mistakes and deeply regrets them. At 40 years old, Patrick finds himself on a road towards redemption. Despite his criminal pitfalls, his family support remains steadfast and they continued to visit him regularly at the MDC until visitation was suspended due to Covid.

His father, Patricio Juarez, is 70 years old and suffers from epilepsy (PSR ¶ 49) and his mother, Luisa Juarez, is 68 years old (*Id*), speak of their son as a loving, devoted father who is deeply remorseful and cogently aware of his mistakes and working towards a better future.[14] Patrick describes his only sister Grace as his "best friend with whom he has always maintained an amazing relationship." PSR ¶ 50.

Patrick comes from a close-knit family and they are supportive of one another. PSR ¶ 51. Despite his incarceration, he remains a devoted and doting father to his 3 children[15] whom he never fails to make laugh. His oldest daughter, Jazabel, who is 19 years old, is enrolled in college studying veterinary sciences (PSR ¶ 54) and fondly recalls the many laughs they shared:

> I'm so thankful to have a father like him because there's not a lot of children who has [sic] a caring/loving parent like him.
>
> \*\*\*
>
> I miss him making silly jokes and having me and my siblings laughing so much until our stomachs hurt.

---

[13] See *US. v. Patrick Juarez* (EDNY) 07-cr-0699, where Patrick pled guilty to Conspiracy to Distribute and Possess with Intent to Distribute five kilograms or more of cocaine, and was sentenced to 28-months (time served). PSR ¶ 36.
[14] *Exhibit F* is a collection of letters written in support of Patrick and bate stamped 001-007 for ease of reference.
[15] PSR ¶ 54. Patrick's 3 children are the result of a union with Lucy Reyes. Despite parting ways, they continue to successfully co-parent their children.

*Exhibit F at 001*.

Patrick's son, who is 14 years old, laments over not having his father in his life:

> I need him in my life, and I miss him a lot. I just graduated from middle school and wish he was there but was unable to. I miss my dad taking me to school. He always made me laugh all the times. I just wish that he was here with me. I pray every day for him to come home and I hope that God hears my prayers soon.

*Id. at 002*.

Angelina, Patrick's 18-year-old daughter, acknowledges that Patrick's repeated absences are due to his own wrongdoing, but nevertheless recalls him creating "unforgettable memories" that she'll forever hold in her heart. *Id. at 003*. Among the sentiments articulated by Angelina is her desire that Patrick be released in time to see his youngest son graduate from high school. *Id.* ("I would love for him to at least be there for my brother because he is the youngest and still has time to make it to his H.S. graduation. I don't want my brother to feel how my sister and I felt when that time came.") Perhaps the greatest testament to Patrick's devotion to children is evident in the care and love he shows to his 17 year olf nephew, RF. RF, the son of Patrick's sister, Grace, considers Patrick to be a surrogate parent who filled the void of an absent father:

> Even though he is my uncle, I consider him my dad. He has always been there for me. He always gave me good advice and always made sure that I did my homework and made sure I did well in school. **As I was growing up, I didn't have my biological father there for me but my uncle never let me feel my biological father's absence. If he bought anything for his kids, he always included me in as if I was his own child**.

*Id. at 004*. (emphasis supplied).

Grace too recalls Patrick stepping-in as a father figure to RF: "I was a single mother and my brother Patrick was there for me and my son. He always treated my son as his own, he never treated him any different than his own kids." *Id. at 005*. Patricio, Patrick's father, laments over Patrick's inability to be present for his children's milestones: "it breaks his heart not [sic] be able to seem them grown, attend their birthdays, or their children." *Id. at 006*.

Patrick's mother Luisa recognizes that while Patrick's transgressions has led him to incarceration, he is now "suffering for his consequences" and is deeply remorseful. *Id. at 007*. She recalls that "[o]ne day I went to visit him, he broke down and cried, telling me that he regrets getting caught up in that life style." *Id*. Patrick is not beyond redemption and is looking forward to the future. "He is always asking for books so he can keep himself busy" (*Id*.) and "loves to read to better himself" (*Id. at 006*). Patrick has been diligently studying for the real estate licensing exam "because he wants to turn his life around". *Id. at 007*.

Finally, it should be noted, that notwithstanding the challenges presented to Patrick during his pre-sentencing confinement, he has sustained no disciplinary infractions (PSR ¶56) and demonstrated

exemplary success in his position as a "unit Volunteer Barber Orderly". Attached as *Exhibit G*, is Patrick's work performance rating from the Bureau of Prisons, dated, August 10, 2020, which provides that:

> Inmate Juarez is an outstanding orderly. Inmate Juarez perform his duties with little to no supervision. Inmate Juarez assists other inmates in their duties in addition to his own. Inmate Juarez is an outstanding orderly who goes above and beyond to ensure the unit is clean and works well with others. He is well organized, dependable, timely, and always brings a positive attitude to his work.

Thus, although Patrick is a volunteer and receives no compensation for his efforts, this outstanding review contains perfect assessments across the board – proving that he is an ambitious individual who has proven to work well with others, is productive, dependable, and has, put simply, embarked on a path toward becoming a productive member of society.

***

Undoubtedly Patrick made a series of mistakes. However, he has readily conceded his errors and He unequivocally takes responsibility for his actions and humbly asks Your Honor to see him not for the sum of his mistakes but for the man who has learned, albeit the hard way, from them and stands ready for the chance to re-enter life and start anew. For these reasons, we respectfully ask the Court to consider imposing a sentence of Time Served on Patrick so that he may return to his family and continue his successful efforts toward rehabilitation.

Dated:    New York, NY
          December 11, 2020

                                                    *Eric Franz*
                                                    _____
                                                    Eric Franz
                                                    Law Offices of Eric Franz, P.L.L.C.
                                                    220 Old Country Road
                                                    Mineola, New York, NY 11501
                                                    (212) 355-2200
                                                    eric@efranzlaw.com